# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMANDA MARIE VOORHEES, | CASE NO. 3:13-cv-02583-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| | MEMORANDUM |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | Docs. 1, 12, 13, 16, 17, 18, 19, 22, 23 |
| Defendant. | |

## MEMORANDUM

## I.    Procedural Background

On March 28, 2008, Amanda Marie Voorhees ("Plaintiff") filed as a claimant for disability insurance benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a date last insured of September 30, 2007.[1]    (Administrative Transcript (hereinafter, "Tr."), 16).

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord* *Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

Plaintiff also applied for Social Security Child's Insurance Benefits ("CIB") pursuant to 42 U.S.C. § 402(d) and initially claimed a disability onset date of July 2, 2003, and later amended onset to January 1, 2006,[2] when she was twenty-years-old. (Tr. 16, 18, 68, 233).[3]

On March 31, 2010, Administrative Law Judge (ALJ) issued an unfavorable hearing decision. (Tr. 95-113). Plaintiff filed a request for review, and on December 28, 2010, the Appeals Council remanded the case for re-determination. (Tr. 114-118). The ALJ held an additional hearing on June 21, 2011. (Tr. 36-63). On July 15, 2011, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 13-35)). Plaintiff sought review of the unfavorable decision which the Appeals Council denied on August 12, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

---

[2] During the hearing dated June 21, 2011, there was a motion to amend the onset date to September 11, 2007 (Tr. 38), however, there is no mention of this in the ALJ decision dated July 15, 2011.

[3] Entitlement to CIB benefits requires that a claimant show, *inter alia*, that she became disabled before her twenty-second birthday. *Beety-Monticelli v. Comm'r of Soc. Sec.*, 343 F. App'x 743, 745 (3d Cir. 2009); 42 U.S.C. § 402(d); 20 C.F.R. § 404.350. This is considered a "child's benefit" because it is paid on the parent's Social Security earnings record. *See Holmes v. Astrue*, No. CIV. 09-5342 FSH PS, 2012 WL 893069, at *1 (D.N.J. Mar. 14, 2012). Social Security Ruling states that "[i]n most title II childhood disability cases, a precise onset date need not be established as long as disability is found to have begun prior to attainment of age 22." SSR 83-20.

On October 17, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  Doc. 1.  On January 15, 2014, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  Doc. 12, 13.  On February 26 and 27, Plaintiff filed a brief in support of the appeal ("Pl. Brief") and an additional exhibit.  Doc. 16, 17.  On March 27, 2014, Defendant filed a brief in response.  Doc. 18 ("Def. Brief").  On April 10, 2014, Plaintiff submitted a reply brief.  Doc. 19 ("Pl. Reply").  On November 5, 2014, the Court referred this case to the undersigned Magistrate Judge.  Both parties consented to the referral of this case to the undersigned Magistrate Judge, and an order referring the case to the undersigned Magistrate Judge was entered on March 20, 2015.  (Doc. 23.)

## II.     Relevant Facts in the Record

Plaintiff was born on July 2, 1985, and thus was classified by the regulations as a younger person through the date of the ALJ decision rendered on July 15, 2011.  20 C.F.R. § 404.1563 (c); (Tr. 233).  Plaintiff completed the tenth grade, withdrew from high school in October 2003, received a GED in 2004, and attended

training as a certified nursing assistant in 2005 but did not complete the program. (Tr. 69, 252). Plaintiff has two young children who are not in her physical custody and with who she could only have supervised visits. (Tr. 48, 54-55, 79). Plaintiff has been incarcerated from April 23, 2009, to May 1, 2009, on probation, and charged with neglect of her eldest child. (Tr. 76, 79-80, 678, 688-89, 694, 702-03, 705-07).

Earnings reports demonstrate that Plaintiff has worked several jobs with the following annual earnings: 1) 2004: met earning threshold for three quarters of coverage with two employers,[4] totaling $3465.68; 2) 2005: met earning threshold

---

[4] After 1977, the Commissioner of the Social Security Administration determines the amount of taxable earnings that will equal a credit for each year which is determined by using a formula in the Social Security Act that reflects a national percentage increase in average wages. 42 U.S.C.A. § 413; 20 C.F.R. § 404.140; 20 C.F.R. § Pt. 404, Subpt. B, App.; "Quarters of coverage," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 8:10 (2nd ed.) (list of earnings needed to earn one quarter of coverage for years from 1975 to 2012); *see also* "Amount of earnings needed to earn one quarter of coverage" https://www.socialsecurity.gov/oact/cola/QC.html#qcseries (last accessed September 14, 2015) (list of required earnings through 2015).

In a claimant's earnings record, a "c" indicates that a claimant has earned enough to qualify for a quarter of coverage and an "n" indicates that the threshold amount was not earned in a given year. *See* "Understanding an earnings record," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.). For example, in 2000, "cccc" would indicate that a claimant has earned at least $780 each quarter of 2000 and "cccn" would indicate that a claimant earned at least $780 for the first three quarters of 2000. *See* "Understanding an earnings record," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.); "Amount of earnings needed to earn one quarter of coverage" https://www.socialsecurity.gov/oact/cola/QC.html#qcseries (last accessed September 14, 2015) (list of required earnings through 2015).

for two quarters of coverage with four employers, totaling $2456.43; 3) 2006: met earning threshold for first three quarters of coverage with two employers, totaling $2972.43; 4) 2007: did not meet earning threshold for any quarter of coverage with one employer, totaling $207.25); 2008: none. (Tr. 240-41, 248-49). In a Work Activity Report dated May 1, 2008, a Social Security Agency reviewer noted that her work history looked "like a string of unsuccessful work attempts" which would be "[consistent with] symptoms shown by many [with] depression and borderline personality disorder--working fulltime for short periods, but then, leaving abruptly." (Tr. 266) (capitalization modified from original).

Prior to that, high school attendance records appear[5] to show that: 1) in the 2001 to 2002 school year, Plaintiff had twenty-three excused absences, sixteen tardy arrivals, nine "HD" days, nine unexcused absences, and three days of suspension; 2) in the 2002 to 2003 school year, Plaintiff had eight excused absences, three tardy arrivals, one "HD" day, twelve illness-related absences, and four days marked "EXD"; and, 3) in the 2003 to 2004 school year, before Plaintiff

---

[5] Definitions of the abbreviations were not provided, however, it appears that the shaded days are for official school closures, "TDY" means tardy, "EXC" means excused absence, "UNX" means unexcused absence, "SUS" means suspension, and "ILL" means absence due to illness. Upon remand, these abbreviations can be clarified. *See* (Tr. 253-255).

withdrew on October 6, 2003, Plaintiff had one excused absence, one tardy arrival, twelve illness-related absences, and one day marked "EXD" out of a total possible twenty-five days of school.  (Tr. 252-55).

## A. Plaintiff's Self-Report and Testimony

In a function report dated May 1, 2008, Plaintiff reported that she would stop working at a job after a few weeks because she could not concentrate or focus and she just wanted to get out.  (Tr. 275).  In a subsequent function report dated May 13, 2008, she described her daily activities in the mental health facility which included attending the facilities programs during the day, attend Alcoholics Anonymous (AA) meetings in the evening, return to take medications, read a book, and sleep.  (Tr. 288).  Plaintiff reported that she had visits with her son in addition to any other scheduled programs of the facility.  (Tr. 288).  Plaintiff reported that it was difficult to fall asleep and once asleep she does not want to get up.  (Tr. 288). While at the facility, Plaintiff described that she prepares hotdogs, boxed and can foods once a week and that she takes turns with the other residents to prepare meals.  (Tr. 289).

Plaintiff stated that she gets outside of the facility five times a week and walks or drives. (Tr. 290). Plaintiff reported that she shops once a week for thirty minutes in stores and indicated that she was able to count change and have a savings account, but unable to pay bills or use a checkbook. (Tr. 291). Plaintiff explained that since she did not have money, she didn't have any experience with paying bills or using checks. (Tr. 291). Plaintiff reported that her illness caused her to lose "interest in [her] sickness." (Tr. 291). Plaintiff reported that she engages in social activities and listed that through her mental health program and AA, she goes to daily meetings, groups, talks and hangs out. (Tr. 292). Plaintiff reported that she does not have any problems getting along with family, friends, bosses, teachers, police, or other people in general or other people in authority. (Tr. 292).

Plaintiff said that her illness made her talk too much. (Tr. 292). Plaintiff indicated that she had problems paying attention, explaining that she got lost in thought and was easily distracted. (Tr. 293). Plaintiff indicated that she could follow written instructions, however, she had difficulty following spoken directions and that she needed them repeated. (Tr. 293). Plaintiff reported that she

had never lost a job due to problems getting along with people, that stress or changes in schedule mess up her entire day, and that she has to write things down in order to remember.  (Tr. 294).  At the time of completing the function reports, she lived at a mental health halfway house and stated that she planned to move into an apartment by July.  (Tr. 285, 287).

In Social Security agency forms regarding recent medical treatment and current medications dated May 11, 2011, Plaintiff listed her treatment providers and wrote that she was currently working on getting Medicaid to pay for counseling.  (Tr. 366).  For list of medications, Plaintiff indicated "none at this time because no insurance."  (Tr. 367).

In a hearing dated December 2, 2009, Plaintiff was not present and had a representative arrive on her behalf due to the fact that she was currently hospitalized. (Tr. 89).

In a hearing dated March 8, 2010, Plaintiff testified that she was not taking any of her medications because she recently moved from Pennsylvania to New York, in the process of getting Medicaid, and switching treatment facilities.  (Tr. 74).  Plaintiff testified that the last time she was medicated was last Tuesday, six

days prior.  (Tr. 81).  Before she ran out of medication she was on: 200 milligrams of Lamictal, 150 milligrams of Effexor, five milligrams of Ambien, 75 milligrams of Atarax, and 80 milligrams of Geodon twice a day.  (Tr. 82).  Plaintiff testified that when she was on the medications she was doing well, however, still reported that she had been unable to read or watch T.V., or engage in any activities that she enjoys for about four to five months.  (Tr. 85).  Plaintiff reported that when she grocery shops, it is as a family, that she did not socialize with any friends, just with her parents.  (Tr. 85).

Plaintiff testified that as a result of a neglect charge, she is required to be supervised in the presence of her children.  (Tr. 79).  Plaintiff explained that the neglect charge stemmed from when she was taken off of medication and "went after [her] fiancé and [her] oldest son with a knife."  (Tr. 80).

Plaintiff testified that from July 2008 through December 2008, she had lived with her mother.  (Tr. 81).  Plaintiff testified that since January she had been living with her fiancé and two children and that she is supervised by either her fiancé or her mother.  (Tr. 79).  When her fiancé is at work, her children go to daycare thirty hours a week, in part because she is not allowed to be with her children

unsupervised, and because she cannot take care of the children full-time. (Tr. 79-80, 84). Plaintiff testified that she wakes up at 6:00 a.m. with her fiancé, helps get the children ready, then go together to drop the children at daycare, then she would drop her fiancé off and return home. (Tr. 84). Plaintiff stated that she generally does not eat during the day, and for the days were the children have not eaten dinner at the daycare, she would make something simple. (Tr. 84-85).

Plaintiff reported that the last time she used illicit substances was in December prior to her hospitalization and her last rehab treatment was in May. (Tr. 75). After stay in a mental health halfway house in June, Plaintiff moved to live with her mother in July and started a day program Northern Tier Counseling where five days a week from 9:00 a.m. to 3:00 p.m., where she would receive education in independent living skills in a group of approximately seven people. (Tr. 82). Plaintiff testified that her mother would drive her to the day program until she stopped in November when she had an altercation with one of the counselors. (Tr. 83).

Plaintiff testified that she stopped her jobs due to depression, anxiety, and relocating, that she has never had a full-time job, and only one job that had lasted

more than three months. (Tr. 70-72). Plaintiff explained that she cannot remain at a job because it would be too difficult to accomplish tasks, she would get confused, she could not focus, depression would worsen and she would get overwhelmed easily. (Tr. 72). Plaintiff testified that she experienced anxiety symptoms of shortness of breath, shakiness, sweating every day, roughly five or six times per day. (Tr. 72). Plaintiff stated that daily living, cleaning, cooking, and trying to care her children, becomes overwhelming and would precipitate the anxiety symptoms. (Tr. 73). Plaintiff testified that her depression symptoms included hurting all over, crying frequently, and lacking motivation. (Tr. 73). Plaintiff testified that she cries daily and every other day she is not functioning or getting out of bed. (Tr. 73). With regard to the mood disorder, Plaintiff testified that she experiences highs where her mind is racing and she cannot sit still and experiences lows. (Tr. 73). Plaintiff also described that due to her posttraumatic stress syndrome ("PTSD") she does not like to go places by herself. (Tr. 74). Plaintiff reported that she does is unable to watch TV, read, or play video games, because she lacks the motivation and cannot remain focused. (Tr. 74, 85). Plaintiff testified that she does the bare minimum of house work and that her fiancé helps

her because she gets overwhelmed. (Tr. 78). Plaintiff reported that she does not drive often because she's concern about her ability to pay attention. (Tr. 78-79). Plaintiff testified that she did not pursue any treatment or counseling during 2006 or 2007 because she was working part time. (Tr. 77).

In a hearing dated June 21, 2011, Plaintiff testified that since moving back to Pennsylvania, she had been unable to get Medicaid insurance, speculated that she made an error in filling the paperwork, and was going to reapply. (Tr. 50). At the time of the hearing she was not taking any medications, stating that she ran out in January 2010 when she could not get Medicaid and could not afford prescriptions. (Tr. 51). Plaintiff was living with her parents stating that she did not think that she could live on her own. (Tr. 48). Plaintiff no longer lived with the father of her children explaining:

> I couldn't go anywhere, I couldn't do anything. I tried to have a schedule with the kids which I managed, but I still needed help and assistance. I was trying to get into mental health after I received New York Medicaid. He didn't want me to go, and he thought they were going to make me worse, and that I -- he could handle me.

(Tr. 48-49). Plaintiff testified that she stopped going to Family Services for treatment because she could not tell the staff member everything that was going on

in her life, she was afraid about the father of her children, and she even after going there three or four times, had yet to see a doctor. (Tr. 51). Plaintiff reported that the staff member tried to help but when she returned home to her fiancé, he would disagree with everything she said, and "it was making things harder for me so [she] stopped going." (Tr. 51).

Plaintiff reported that she has a two-year-old and a four-year-old who live with their father and she has supervised visits, whenever he agrees to it, for one hour per week. (Tr. 54). Plaintiff stated that the visits had to be supervised due to drugs and alcohol and that supervision was takes place at the YWCA. (Tr. 54-55).

Plaintiff testified about her last failed work attempt at a deli and register, her difficulty correctly finishing sandwich orders, and her overreaction and getting loud with customers. (Tr. 41-44). Plaintiff testified that she would take unscheduled breaks every hour and a half to cope with anxiety symptoms, trouble breathing, and feeling overwhelmed. (Tr. 44-45). According to Plaintiff, her supervisors allowed it to a point until it interfered too much with the work environment. (Tr. 46). Plaintiff described her symptoms since the last hearing in March 2010, which included cutting herself in in April 2011, still crying a lot, still

having trouble getting out of bed every other day, and experience pain throughout her body every day. (Tr. 46, 52). Plaintiff reported that she experienced panic attacks five to six times each day lasting up to a half an hour, where she feels like she is going to faint and cannot breathe. (Tr. 46-47). Plaintiff reported that her symptoms prevent her from focusing such that she is unable to read, watch television or movies, or play video games. (Tr. 47-48, 52). Plaintiff reported that she still had problems with daily anger outbursts and if she can detect the signs she will walk away from the situation, otherwise, her mother or father "ends up getting hurt." (Tr. 48).

Regarding her PTSD symptoms, Plaintiff testified:

It's worse now, scared and paranoid about certain men and people I see. If somebody gets loud, I'm scared, crying. Even at work recently, somebody's screaming about something, and I got scared and cried and it was just a mess. I don't drive myself hardly ever. My mom or a friend will drive me if I need to go to an appointment. I don't like being alone. I'm with my mom most of the time.

(Tr. 49). Plaintiff reported that she did not socialize at all, with the exception that she talks to another mental health patient friend who drove her to the hearing. (Tr. 53). Plaintiff reported that she started going to church, however, missed the last three weekends because she only feels comfortable if her aunt sits next to her and

if she sits in the same location. (Tr. 53). Otherwise, she experiences panic attacks at church. (Tr. 53). Plaintiff reported that she has had suicidal thoughts the day prior and experiencing suicidal thoughts every day for the past three weeks. (Tr. 53). Plaintiff reported that she has tried to call her therapist but her therapist was out of town and would not return until next week. (Tr. 53).

Plaintiff reported that she regularly experienced nightmares and flashbacks. (Tr. 49). Describing the flashback Plaintiff stated:

> Like, I feel like I'm in the moment right then where he's like, yelling at me and putting me down and pushing me around, and I actually can like, feel it, and it's like, it's really happening and then, like, then that's when I can grab ahold of something and try to bring myself out of it.

(Tr. 49-50). Plaintiff testified that she has problems being around men and provided as an example from her most recent job:

> A gentleman recently slammed his hand down in the deli, and I went to the floor scared, crying, and he's, like, what's wrong with you? And I couldn't even talk at that point to explain what was going on. I just felt a threat from him, and then I just, I don't know, how do you explain something like that to somebody that doesn't understand.

(Tr. 50). Plaintiff explained that her counselor recently advised her to feel something familiar, like some fabric, in order to bring herself out from a flashback. (Tr. 49). When ask about when she used to take medication whether she believed

they were working, she responded that she thought some of them were, and added "I don't know." (Tr. 51). In response to further questioning, Plaintiff added that she felt better with medication and that she did not experience any side-effects. (Tr. 51-52).

Plaintiff testified that the last time she drank alcohol was May 7, 2011, April 20, 2011, was the last time she smoked weed, and March 20, 2011, was the last time she had used cocaine. (Tr. 53-54). Plaintiff reported that she accessed the cocaine when her fiancé would bring it home and that prior to this relapse she was "clean and sober" since January 2010. (Tr. 54).

### B. Relevant Treatment History and Medical Opinions

### 1. The Meadows Psychiatric Center: Nalin Patel, M.D.; Sarah E. Boone, C.S., M.S.C.

A discharge report dated August 21, 2001, indicated that Plaintiff was admitted August 17, 2001, and was discharged against medical advice on August 21, 2001. (Tr. 373). Plaintiff was sixteen-years-old at the time of the admission and was originally transferred from the Robert Packer Hospital after a suspected

overdose. (Tr. 373). Plaintiff was admitted with at GAF 48.[6] Plaintiff was discharged with a diagnosis of depressive disorder, not otherwise specified, adjustment disorder with disturbance of emotions and conduct with a GAF score of 50. (Tr. 377).

This was her second Meadows hospitalization for the year. (Tr. 373). The last one being in March after an overdose on Tylenol which led to her hospitalization in Pittsburgh for possible liver transplant. (Tr. 374). Plaintiff stated that she has been in counseling but stopped in June. (Tr. 374).

Plaintiff reported that leading up to the admission she had been in foster care for four days and prior to that had been living with her step-brother's mother

---

[6] *See Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. *Id.* The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. . . . . A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.*").

because of not wanting to be at home. (Tr. 373). Plaintiff went to Children and Youth Services due to her biological mother not wanting her to be living with the step-brother's mother and Children and Youth Services placed the Plaintiff in temporary foster care. (Tr. 373). The foster parents noted that Plaintiff was ill and suspected that she had taken an overdose. (Tr. 373). While in foster care, Plaintiff was not allowed to see her boyfriend and she had written a note to her boyfriend stating that she did not want to go on living without him. (Tr. 373). Two months prior, Plaintiff took codeine that she got from another child in the home. (Tr. 373).

Plaintiff was found with a bottle of codeine and she said that this bottle had been empty for quite some time. (Tr. 374). Plaintiff described initial insomnia without early morning awakening, denied difficulties with her appetite, concentration or energy, and denied current suicidal ideation, or homicidal ideation or auditory or visual hallucinations. (Tr. 374). In the past, Plaintiff had engaged in self-injurious behaviors such as cutting herself or burning herself. (Tr. 374). Plaintiff denied a history of manic or hypomanic moods and reported no history of psychotic symptoms. (Tr. 374). Regarding the note she wrote to her boyfriend, she said she just felt like she did not want to live, but she never said that she was

going to kill herself.  (Tr. 375).  Plaintiff "adamantly denied any suicide attempt since her last admission in March of 2001" and she also claimed that she had not been self-abusive, like cutting herself or burning herself, since her last admission in March of 2001.  (Tr. 375).  She denied any legal problems or having problems with her temper.  (Tr. 375).

At the time of the discharge report Plaintiff was on Celexa 20 mg.  (Tr. 374). Plaintiff reported smoking a half pack of tobacco per day and has been using it for one and a half years.  (Tr. 374).  Plaintiff reported drinking alcohol in the past, but denied current use and denied the use of marijuana or other substances.  (Tr. 374). Plaintiff denied a history of physical or sexual abuse.  (Tr. 374).

Upon examination Plaintiff was cooperative and engaged with the interview. (Tr. 375).  Dr. Patel observed that Plaintiff maintained good eye contact had normal speech with a clear and coherent thought process.  (Tr. 375).  Plaintiff was is alert and oriented to time, place, person, date and season.  (Tr. 375).  Plaintiff knew the current president, was able to register three out of three items initially and recall them at 5 minutes, and was able to spell the word "World" forward and backwards without difficulties.  (Tr. 375).  Plaintiff reported that e current does of

Celexa was helping her with her depression and did not need any adjustments to her medication.  (Tr. 376).

Although Dr. Patel discussed the possible benefits of further treatment, Plaintiff "remained adamant about wanting to be discharged," continued to deny suicidal ideation, intent or plan and contracted for safety outside the hospital.  (Tr. 375).  As such there were no grounds for an involuntary commitment.  (Tr. 376)

## 2.  Robert Packer Hospital: Poni S. Bishop, M.D.; Richard L. Bishop, M.D.; Cario A. Oller, M.D.; Michael J. Georgetson, M.D.; James J. Walsh, M.D.

On February 27, 2001, Plaintiff was transferred from Troy Community Hospital due to a Tylenol overdose.  (Tr.499).  Dr. Georgetson recommended discussing the case with a pediatric hepatology and transplant team from a transplant institution, which in turn recommended transport to their institution in Pittsburgh.  (Tr. 499).

On August 8, 2001, Plaintiff sought E.R. treatment for cutting her wrist, breast, and ankle.  (Tr. 497).  For her history it was noted that in February 2001, Plaintiff overdosed on Tylenol and at that time had to be transferred by a flight to

Pittsburgh for further treatment after the and she spent three weeks down at The Meadows for inpatient psychiatric care. (Tr. 497). When Plaintiff was discharged home, she was placed on Celexa 20 mg and was following up with Northern Tier system. (Tr. 497). Plaintiff denied any suicidal or homicidal ideation, and denied taking any drugs or drinking alcohol. (Tr. 497). Plaintiff reported smoking one pack of cigarettes a day. (Tr. 497).

An emergency treatment record dated August 17, 2001, noted that Plaintiff's foster parents brought her due to a possible overdose of unknown sleeping medications. (Tr. 379). Dr. Bishop noted that Plaintiff changed her story multiple times. (Tr. 379). According to the foster parents, Plaintiff was brought to the Emergency Room last week when she had been living with her father's previous wife because she had cut herself on the wrists. (Tr. 379). While in the foster home, Plaintiff she was given curfews, she shared a room with a foster sister almost her age, and she was not allowed to see her boyfriend anytime she wished. (Tr. 379). Plaintiff sent notes to the boyfriend via the foster sister and received medications apparently from the boyfriend through the foster sister to help her settle her nerves. (Tr. 379). Plaintiff stated that she had been taking these

medications because she has not been sleeping well. (Tr. 379). According to the foster family, Plaintiff's usual habits were to stay up until one or two in the morning and then sleep until noon. (Tr. 379). Plaintiff reported that she initially left her own home due to fighting with an older brother who had threatened to beat her. (Tr. 379). Plaintiff reported that she smoked a pack a day when available. (Tr. 379). Dr. Bishop noted that laboratory studies included a CBC, toxicity screen, electrolytes, and aspirin and Tylenol levels. (Tr. 379)

In a treatment record dated August 24, 2004, Plaintiff sought treatment due to feeling depressed for the previous two months. (Tr. 390). Plaintiff reported that she has done "bad things" as a result of the depression, including excessive alcohol consumption, use of street drugs including "cocaine, pot and crank," and has had thoughts of dying. (Tr. 390). Plaintiff reported that she can only sleep four hours a night and has decreased appetite. (Tr. 390). Plaintiff reported smoking a pack a day, and that she drinks to get drunk so that she "would not be aware of anything." (Tr. 390). Plaintiff reported no history of chest pains, palpitations, or difficulty breathing. (Tr. 390). Urines tests were positive for cocaine and cannabinoids. (Tr. 390). After evaluation she was referred to Northern Tier and also for help with

drug rehabilitation. (Tr. 390). Plaintiff's discharge diagnoses were depression and substance abuse. (Tr. 390).

On April 14, 2006, Plaintiff sought treatment after being assaulted by her boyfriend. (Tr. 495). Plaintiff reported no past medical history and not taking any medication. (Tr. 495). Plaintiff reported that he now ex-boyfriend grabbed her neck, slammed her to the floor, and she was hit a couple times in the head. (Tr. 495). Plaintiff reported no loss consciousness, however, was experiencing "moderate-to-severe pain in her neck and some abdominal pain, left upper quadrant" and Dr. Oller observed some bruising. (Tr. 495). Plaintiff reported having been abused in the past by her boyfriend but she never sought help before except when she saw another doctor recently who documented some bruising. (Tr. 495). Plaintiff reported that she smokes cigarettes and drinks alcohol. (Tr. 495).

### 3. Northern Tier Counseling Inc.

In a treatment record dated October 8, 2001, Plaintiff recounted her recent history with her time in foster care, her boyfriend and her family situation. (Tr. 382). She was diagnosed with adjustment disorder (code 309.4) and assessed with a GAF score of 55. (Tr. 382). Examination observations were mainly

unremarkable, with exception that her insight and judgement were fair to poor. (Tr. 383). It was noted that her current functioning was good and her attitude to authority was "Ok," and she does not get along with other peers except for one friend, and her peers call her names. (Tr. 384). In the treatment plan dated October 8, 2001, Plaintiff was listed to have depression and anxiety. (Tr. 386). A treatment record dated May 8, 2002, indicated that Plaintiff was discharged due to refusal or withdrawing from treatment. (Tr. 387).

### 4. Arnot Medical Service: Vicki L. Haight, M.S.N., C.R.N.P.; Tricia T. Williams, M.D.

On November 22, 2005, Plaintiff sought a physical evaluation for her to participate in a nursing assistant training program. (Tr. 399).

On May 9, 2006, Plaintiff sought treatment following an emergency room visit due to abdominal pain after drinking eight to ten beers. (Tr. 396). Plaintiff was accompanied by her mother. (Tr. 396). Dr. Williams noted Plaintiff had a previous history of alcohol abuse, Tylenol overdose, major depression, and domestic violence; "however, in the past 2 months, she has left her boyfriend and has had no domestic violence." (Tr. 396). Plaintiff also reported that she had not

been drinking or using any drugs in the previous two months.  (Tr. 396).  Plaintiff denied any suicidal ideation or symptoms of depression and it is noted that it was an "isolated incident of binge drinking."  (Tr. 396).  Dr. Williams provided extensive counseling regarding the harmful effects of alcohol abuse, pancreatitis and cirrhosis due to her previous history of a Tylenol overdose.  (Tr. 397).

In a treatment record dated June 1, 2006, Plaintiff reported that she might be pregnant and stopped taking the medication prescribed for her urinary tract infection upon having two positive home pregnancy tests.  (Tr. 395).  Plaintiff reported that the father of her baby is her former abusive boyfriend with who she was not in current contact.  (Tr. 395).  Urine test in the office confirmed the pregnancy.  (Tr. 395).

## 5.  St. James Mercy Hospital: Chiemeka Nwokonko, M.D.; Toni D. Sisodia, M.D.

In an E.R. record dated January 27, 2007, it was noted that Plaintiff arrived with her husband due to her feeling depressed and overwhelmed but was not currently having suicidal thoughts at the time.  (Tr. 415, 418).  Plaintiff had a baby by emergency C-section a week prior.  (Tr. 415).  It was noted that Plaintiff did not

drink alcohol or smoked since she became pregnant.  (Tr. 416).  Plaintiff reported

that did not realize motherhood would be so overwhelming.  (Tr. 418).  Plaintiff

reported that she was in a lot of pain from the cesarean section incision wound and

took an extra Vicodin, which her husband interpreted as her being depressed and

suicidal.  (Tr. 418).  Plaintiff "completely denie[d] being suicidal," "seem[ed] to

love her baby and is very connected with him" and indicated that she "definitely

[did] not want admission."  (Tr. 418).  Upon psychological evaluation, Dr. Sisodia

noted:

> She claims that this was a much wanted child. She is married to a man
> who is about 33 and they have a good and loving relationship. There
> are no overt signs of friction in their marriage. Both were agreeable
> and motivated for an out patient plan.

(Tr. 418).    Dr. Sisodia observed that although Plaintiff appeared "somewhat

overwhelmed," she was not a danger to herself or others.  (Tr. 418).  With regards

to her relationship with the father of her baby, Dr. Sisodia observed:

> Interactional dynamics are that the husband is a fair bit older than her
> and childifies her and her affect changes into a, "child," position more
> when he is around. They immediately hug each other and held hands
> throughout the interview. There appears to be no marital friction
> between them.

(Tr. 418).    Dr. Sisodia diagnosed Plaintiff with "adjustment reaction with depressed mood" and assessed her with GAF score of 55.    (Tr. 418).    Upon examination, Dr. Nwokonko noted Plaintiff's depressed mood and affect.    (Tr. 416).    Dr. Nwokonko discharged Plaintiff with the diagnosis of postpartum depression and suicidal ideation.  (Tr. 417).  Drug screening tests taken on January 27, 2007, showed that Plaintiff was negative for phencyclidine, benzodiazepines, cocaine, amphetamines, THC, opiated, and barbiturates.  (Tr. 425).

On March 15, 2008, Plaintiff was transferred from the Davenport Emergency Room where she was taken because she was suicidal. (Tr. 583)

### 6. Troy Community Hospital: George Abraham, M.D.; Deryck W. S. Brown, M.D.

A treatment record dated February 27, 2001, summarized Plaintiff's recent history of an overdose of forty-five tablets of 500 mgs of Tylenol and twenty-five mgs of Benadryl.  (Tr. 483).  Dr. Brown noted:

> After further questioning, the mother indicated she is being treated at Northern Tier counseling for depression. She smokes cigarettes daily . . . . It is strange, but she has not been put on medications from Norther Tier Counseling. If she was, we were not given this information by the mother.

(Tr. 483). Upon examination Dr. Brown observed:

> We have here a drowsy teenager, who seems quite indifferent to what is happening around her. She does not seem aware of the seriousness of her accident.

(Tr. 483). In treatment records dated July 16, 2004, May 26, 2005, and September 23, 2005, Plaintiff reported a daily smoking habit, occasional alcohol use, and no psychiatric medications are listed. (Tr. 466, 470, 481).

In a treatment record dated May 7, 2006, Dr. Brown noted that during treatment for alcohol-induced gastritis, after the first liter of IV fluid, Plaintiff decided that she would not stay and yanked the intravenous out of her arm and decided she would leave against medical advice. (Tr. 455). After looking into her medical history Dr. Brown noted that Plaintiff "had a troubled checkered past" and described her medical history starting from her Tylenol overdose when she was sixteen. (Tr. 455). Dr. Brown noted that "this time around her cat got killed and the result triggered her into a drinking binge." (Tr. 455, 464). Plaintiff's diagnosis was "Acute alcoholic gastritis, possibly with pancreatitis" and Dr. Brown educated Plaintiff that with the changes in her pancreas, continued drinking could lead to

developing pancreatitis which would create a "lifelong problem of pain and hospital admissions." (Tr. 455).

An emergency room treatment record dated July 30, 2007, noted that Plaintiff had not received follow-up treatment after her cesarean section six months prior and that she indicated she was sexually active a day after she was discharged from the hospital. (Tr. 430). Plaintiff reported that stopped living with her boyfriend a week prior, filed a Protection from Abuse ("PFA") order against her boyfriend and she moved in with her family. (Tr. 430). Plaintiff reported that she currently smoked a half a pack of cigarettes a day and occasionally drinks alcohol. (Tr. 430).

On August 27, 2007, Plaintiff visited for a job physical. (Tr. 509). It was noted that she was a single mother, recently separated from her boyfriend due to him being too possessive, and that she lived with her parents. (Tr. 509). Plaintiff reported that she smoked a half pack of cigarettes a day, did not drink. (Tr. 509). It was noted that Plaintiff was not currently taking any medications. (Tr. 509).

///

///

### 7.  Bradford Regional Medical Center: Firoz P. Rahman, M.D.

In a treatment record dated December 23, 2007, it was noted that Plaintiff was living in a shelter, mother of an 11-month-old son of whom she has joint custody, unemployed, and seven weeks pregnant.  (Tr. 518).  Plaintiff reported that Child Protective Services were involved and they were not allowing her to move back in with her boyfriend and son.  (Tr. 519).  Plaintiff was referred from Stevens County Mental Health to the MICA Unit for the treatment of posttraumatic stress disorder ("PTSD) and alcohol dependence.  (Tr. 518).  Dr. Rahman noted that Plaintiff reported "a long history of mental health issues and polysubstance dependence" including that she was admitted to the psychiatric unit at the age of fourteen for an overdose of Tylenol PM.[7]  (Tr. 518).  Plaintiff stated that she and her friend planned to commit suicide on the same day at school but her friend "chickened out."  (Tr. 519).  Plaintiff was on Lamictal and Geodon and stated that because of her pregnancy, she stopped taking her medication on December 20, 2007.  (Tr. 518).

Plaintiff reported that her mood fluctuated but the intensity was not severe.  (Tr. 518).   Plaintiff believed that her main problem is anger and difficulty

---

[7] Contemporaneous records show that she was sixteen at the time.

controlling her temper. (Tr. 518). She denied having a problem with sleep or appetite, and denied any active thoughts of hurting herself or others. (Tr. 518). Plaintiff reported that her energy level and concentration were slightly down. (Tr. 518). Dr. Rahman stated that in response to Plaintiff's report of mood swings, "manic symptoms were explained to her, she was unable to relate properly." (Tr. 518). Plaintiff reiterated that she believed that the anger was the main problem. (Tr. 518). Regarding her mental health and polysubstance abuse history, Dr. Rahman wrote:

> It is important that her drug of choice is marijuana, alcohol, and crack cocaine. She started using alcohol when she was in the 4th grade. The last use was on September 12, 2007. She admits to blackouts and passing out from alcohol. She is reluctant to tell exactly what she used. According to referred source, beer, vodka. The last use of alcohol was on September 12, 2007. Her last use of crack cocaine was also at the same time. The last use of marijuana was 3 weeks ago. She is unable to abstain from her alcohol or drug use despite the social and occupational consequences. She denied any legal problems. She admits to high cravings. She denied any withdrawal symptoms now but admits to early morning use, concern from others, and complains of withdrawal symptoms when she had attempted to stop them and developed no tolerance. The current symptoms seem to occur in the context of more chronic, emotional difficulties. Her parents were separated when she was 5 years old. According to her, both parents were alcoholics. She was sexually abused at the age of 5 by a baby sitter" when she was in daycare. She was also raped in July 2007 while intoxicated. She also has had significant domestic abuse,

physical and mental, from her boyfriend. She denied any flashbacks or nightmares of the abuse, but stated that she is afraid to go out with the fear that someone will hurt her. The patient reported a long history of chronic feeling of emptiness, feeling of abandonment, anger is a prominent symptom, mood instability adding to the crisis, inappropriate coping techniques together with her anxiety and depression.

(Tr. 518-19).  Dr. Rahman further summarizes:

The longest clean time was 1 year when she was pregnant. The first use of marijuana at the age of 12. The last use was 3 weeks ago. The first use of crack cocaine was at the age of 18. The last use was September 12, 2007. She reported daily use of alcohol and marijuana and sporadic use of crack cocaine. She believes the marijuana helps her to calm down and crack cocaine gives her confidence and alcohol helped her with socialization.

(Tr. 519).  Plaintiff reported that she was court ordered to drug and alcohol counseling.  (Tr. 520).  Plaintiff reported that she dropped out of school in the tenth grade because of her addiction problem, later she got her GED and was in a CNA program for a year.  (Tr. 519).  Her last work was as a cleaner in a motel in Troy in September of 2007.  (Tr. 519).

Upon examination, Plaintiff appeared anxious and restless and maintained sporadic eye contact.  (Tr. 519).  Plaintiff was unable to rate her depression 1 to 10 and denied current suicidal or homicidal ideation, and denied auditory or visual

hallucinations or paranoia. (Tr. 520). Plaintiff was alert and oriented x3 with

immediate and remote memory intact and fair insight and judgment. (Tr. 520).

Dr. Rahman diagnosed Plaintiff with: 1) mood disorder, not otherwise specified

(NOS); 2) polysubstance dependence; 3) posttraumatic stress disorder, by history;

and 4) the need to rule out substance-induced mood disorder, bipolar disorder,

major depressive disorder, and cluster B personality traits. (Tr. 520). Plaintiff's

GAF was 50. (Tr. 520).

In a discharge record dated December 26, 2007, it was noted that she was

admitted December 23, 2007, tests were positive for cannabinoids and alcohol was

less than 0.01. (Tr. 522). Dr. Rahman noted that:

> While in treatment, she expressed an uncooperative and negative
> attitude toward treatment. The patient stated she would remain sober
> during her pregnancy. Participation was none to passive. On the 2nd
> day of treatment, she wrote a letter to staff stating she was signing
> herself out of the program and would not be attending. mandatory
> groups/activities. The patient was advised this would be against
> medical advice and not be in her best interest. She was able to
> understand AMA discharge. . . . [and] signed herself out on the 3rd
> day.

(Tr. 522). Dr. Rahman opined that Plaintiff's prognosis seemed to be "very poor

due to her noncompliance with inpatient treatment, rigid/black and white thinking

pattern, and apparent inability to take counsel that would be in her best interest."
(Tr. 522).

Plaintiff's discharge diagnoses were: 1) mood disorder, not otherwise specified (NOS); 2) polysubstance dependence; 3) posttraumatic stress disorder, by history; 4) cluster B personality traits; and, 5) the need to rule out substance-induced mood disorder, bipolar disorder, major depressive disorder, and cluster B personality traits. (Tr. 522). Upon discharge her GAF score was 55.

### 8. Conifer Park: Brian Gentile, C.R.C., L.M.H.C.; Beth Brownell, R.P.A.

A discharge report dated January 16, 2008, indicated that Plaintiff was admitted January 3, 2008, and was discharged against medical advice. (Tr. 527-28). It was noted that Plaintiff was currently taking Prozac. (Tr. 527). Plaintiff reported being molested as a child and was raped in July 2007 and reported having a hard time trusting others. (Tr. 527). Plaintiff reported having an abusive ex-boyfriend and has a CPS case open due to domestic violence. (Tr. 527). Although Plaintiff has external motivation due to the pending CPS case and court mandated treatment, it was noted that Plaintiff appeared to be at high risk given the lack of addiction knowledge, lack of sober supports, failure to follow through with

aftercare recommendations. (Tr. 527). Prior to discharge, she was referred to Ellis Hospital to evaluate for suicide possibility. (Tr. 527-28). The following problems were identified: 1) Detox; 2) complications with proceeding with drug rehabilitation treatment due to pregnancy; 3) emotional/behavioral conditions which complicate recovery as evidenced by dual diagnosis, history of PTSD, depression and anxiety, and history of cutting, suicidal thinking and domestic abuse; 4. external motivation towards recovery; and, 5) a high risk of relapse. (Tr. 528). The summary of treatment stated:

> [Plaintiff] was seen by psychiatry staff on 1/4/08. Patient reported depression with history of PTSD. [Plaintiff] reported having been treated with Lamictal which had been discontinued due to her pregnancy. [Plaintiff] was started on Prozac. [Plaintiff] was seen on 1/7/08 at which time she was doing well. Patient was seen on [Plaintiff] reporting depression and that she had had passive suicidal ideation on 1/9/08. Patient's Prozac was increased. On 1/16/08 [Plaintiff] was sent to Ellis Hospital due to suicidal ideation. [Plaintiff] returned and was seen by psychiatry staff.

(Tr. 529).

///

///

///

**9. St. Joseph's Hospital: S. Thompson, M.D.; L. Waite, C.A.S.A.C.; W. Irwin, L.M.S.W.; C. Homan, C.A.S.A.C.; W. Shrout, C.A.S.A.C.; P. Willock, C.D.C.; M. Hester, C.D.C.**

On January 24, 2008, Plaintiff was admitted for in-patient rehabilitation after previously leaving two other inpatient facilities (Bradford Recovery and Conifer Park) against medical advice earlier in the month. (Tr. 547). In an intake report dated January 25, 2008, Plaintiff reported the following substance abuse history:

> her first drug of choice is marijuana, which she began to smoke on weekends at age 14 using two joints. At age 16, she smoked the substance daily using two bowls. She smoked the substance daily until 04/06 when she became pregnant and thus stopped using. Then in March of 2007, she smoked on weekends. As of 06/07 or 07/07, she returned to daily use of the substance until 09/11/07 when she stopped. . . . [Plaintiff] reports that she smoked marijuana on 12/13/07 and that was her last use of it . . . . Her second drug of choice is alcohol, which she began to drink once or twice a week at age 16 consuming about six beers and four or five shots of liquor. Daily drinking began at age 18 when she consumed 12 beers and/or half a bottle of liquor. She denies any use of alcohol in 2007 until July of 2007 because she was pregnant. Then she drank every other night and weekends until 09/11/07 when she went into treatment for detoxification. She claims that her last use of alcohol was on 09/11/07. Her third drug of choice is cocaine, which she first smoked one time at age 18. A month later, she began to smoke the substance daily for three months. She then quit until 07/07 and then smoked the substance only on Tuesdays until 09/05/07. From 09/05/07 to 09/11/07, she smoked cocaine daily. Her last reported use was on

09/11/07. [Plaintiff] began to smoke tobacco at age 14, which became daily use at age 16 over the past year, she has been smoking half-a-pack daily until 01/24/08. [Plaintiff] admits the use of the following substances: Ephedrine pills at age 18 four times a day for a few months; crank once at age 18; prescribed Prozac, prescribed Lamictal, and prescribed Geodon. . . . [Plaintiff] has made efforts to quit using these substances. She has spent time recovering from the effects of these drugs. She admitted the following withdrawal symptoms due to her substance use: Nausea, shakes, diarrhea, sweats, and insomnia. She does admit to using both alcohol and marijuana in the morning.

(Tr. 550).

In treatment records dated January 29, 2008, and February 5, 2008, it was noted that Plaintiff experienced "post-acute withdrawal symptoms" of short-term memory loss, and concentration difficulties. (Tr. 537-38). The records also note that Plaintiff was compliant with her psychiatric medication of Prozac. (Tr. 537-38).

A discharge recommendation dated February 19, 2008, marked Plaintiff's twenty-sixth day in treatment and that she had shown improvement with her post-acute withdrawal symptoms. (Tr. 535). The multidisciplinary treatment team deemed Plaintiff fit for discharge after completion of all the goals, observing:

[Plaintiff] is medically stable. She has been eating more regularly over the past week. [Plaintiff] has improved slightly in dealing with her emotional swings. Behaviorally she remains on her intervention until

her discharge. [Plaintiff] external motivation remains the same since her admission. Her internal motivation has steadily increased with each passing week of her stay here. Her assignments have become more detailed, she has been confronting her peers on their being disrespectful and dishonesty. She has told on herself when she was trying to violate her order of protection by trying to call her son's father. [Plaintiff] has increased her understanding of her craving and relapse cycles. She has developed a very basic relapse prevention plan for when she leaves treatment. [Plaintiff] will be going to stay with her parents temporally until she can get her own place to live.

(Tr. 535).

On February 21, 2008, was discharged to a homeless shelter. (Tr. 545).

### 10.Psychiatric Consultative Evaluation: Jeanne Shapiro, Ph.D.

On June 13, 2008, Plaintiff saw Jeanne Shapiro, Ph.D. for a consultative examination at the request of Disability Determination Services (Tr. 617). Dr. Shapiro observed Plaintiff to be cooperative with adequate social skills (Tr. 619). Dr. Shapiro noted that Plaintiff had poor judgment, but she had normal thought processes, mood and affect, attention and concentration, cognitive functioning, and memory. (Tr. 619-20). In addition, Dr. Shapiro noted that Plaintiff was independent in her daily activities and spent her days attending sobriety meetings and parenting classes, reading, journaling, listening to music, and socializing with

friends (Tr. 620). Dr. Shapiro assessed Plaintiff with bipolar disorder NOS, PTSD, and polysubstance abuse in remission.  (Tr. 620).

### 11. Mental RFC Assessment, Richard Nobel, Ph.D.

On June 23, 2008, state agency psychologist Dr. Nobel assessed that Plaintiff's mental impairments resulted in mild restriction in activities of daily living, moderate limitations in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  (Tr. 633). Dr. Nobel further assessed that Plaintiff could be expected to understand, carry out, and recall simple instructions; tolerate stressors and persist at routine, repetitive tasks with moderate difficulty; and respond appropriately to supervision, co-workers, and work situations. (Tr. 639).

### 12. Mental RFC: Phebe J. Cole, C.R.N.P.

On July 27, 2009, Ms. Cole opined that Plaintiff had marked-to-extreme difficulties with understanding and memory, sustaining concentration and persistence, social interaction, and adaptation.  (Tr. 698-99).

///

///

### 13. Cheryl Pruett, M.D.

On December 24, 2008, Dr. Pruett completed a mental RFC assessment. (Tr. 324-25). Dr. Pruett checked boxes indicated that Plaintiff had moderate limitations in the ability to: 1) remember locations and work-like procedures; 2) understand and remember detailed (3 or more steps) instructions which may or may not be repetitive; 3) sustain an ordinary routine without special supervision; 4) work in coordination with or proximity to others without being distracted; 5) respond appropriately to unexpected changes in the work setting and routine; 6) set realistic goals or make plans independently; and, 7) be aware of normal hazards and take necessary precautions; 8) travel in unfamiliar settings and use public transportation. (Tr. 324-25). According to Dr. Pruett Plaintiff had marked limitations in the ability to: 1) maintain attention and concentration for at least two straight hours with at least four such sessions in a workday; 2) Ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable number and length of rests; and, 3) accept instructions and respond appropriately to criticism from supervisors. (Tr. 324-25).

According to Dr. Pruett Plaintiff had no or slight limitations in the ability to: 1) understand and remember short and simple (one or two step) repetitive instructions or tasks; 2) carry out short and simple (one or two-step) repetitive instructions or tasks; 3) carry out detailed (3 or more steps) instructions which may or may not be repetitive; 4) make simple work-related decisions; 5) interact appropriately with the general public or customers; 6) ask simple questions or request assistance from supervisors; 7) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; 8) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; 9) respond appropriately to expected changes in the work setting and routine. (Tr. 324-25).

Dr. Pruett indicated that the following stressors would likely increase the level of impairment beyond what she indicated as Plaintiff general level of impairments: 1) unruly, demanding or disagreeable customers even on an occasional or infrequent basis; 2) demands for a minimum production output, or quotas; 3) demands for accuracy (intolerance of error rates in excess of five to ten percent); 4) attendance requirements (intolerance of absenteeism beyond one to

two days per month; and, 5) the need to make accurate, independent decisions for problem solving on a consistent basis. (Tr. 325). Dr. Pruitt further indicated that a routine, repetitive, simple, entry-level job would actually serve as a stressor which would exacerbate Plaintiff's psychologically-based symptoms? (Tr. 325). Dr. Pruitt also indicated that Plaintiff was not currently using drugs or alcohol and in response to the question of whether the restrictions would persist if Plaintiff stopped using drugs or alcohol, Dr. Pruitt responded that the question was not applicable. (Tr. 325).

## 14. Treating Psychiatrist: Faiz U. Khan, M.D.

The RFC opinion of Dr. Pruett was submitted to Dr. Khan to review and further opine as to whether Plaintiff's mental limitations would remain in the absence of drug and alcohol abuse. (Tr. 323). Dr. Khan checked indicating that the limitations set forth in the Mental RFC assessment by Dr. Pruett would remain if Plaintiff was not using drugs or alcohol during the period that she alleged disability. (Tr. 323). Dr. Khan added that Plaintiff's limiting symptoms were related to her mood disorder and personality issues and unrelated to her drug use. (Tr. 323).

### 15. Abuse and Rape Crisis Center

In a letter dated May 4, 2011, an administrative assistant confirmed that Plaintiff was receiving counseling from the agency. (Tr. 365).

## III.    Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*,

186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and, (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Id.* The ultimate burden of proving disability within the

meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence is a deferential standard of review.  *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial

evidence.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986);

*Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## A. Plaintiff's Credibility

Plaintiff asserts that the ALJ erred in finding Plaintiff lacked credibility.  Pl.

Brief at 33-35.

Where a medically determinable physical or mental impairment that could

reasonably be expected to produce the individual's pain or other symptoms,

however, the severity of which is not substantiated by objective medical evidence,

the ALJ must make a credibility finding on the claimant's subjective statements.

SSR 96-7p.  The credibility finding must be based on a consideration of the entire

case record.  SSR 96-7p.  In determining a claimant's credibility regarding the

severity of symptoms, the ALJ must consider the following factors in totality: 1)

the extent of daily activities; 2) the location, duration, frequency, and intensity of

pain or other symptoms; 3) precipitating and aggravating factors; 4) the type,

dosage, effectiveness, and side effects of any medication; 5) treatment other than

medication for the symptoms; 6) measures used to relieve pain or other symptoms;

and, 7) other factors concerning functional limitations and restrictions due to pain

or other symptoms.  SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Canales v. Barnhart*, 308 F. Supp. 2d 523, 527 (E.D. Pa. 2004).

### 1.  Requiring Objective Evidence of Subjective Symptoms

The ALJ erred by requiring objective evidence of Plaintiff's subjective symptoms.  Specifically, the ALJ found:

> Rather, a finding of not credible means that the claimant has failed to produce appropriate, probative evidence as required by the Social Security Act, Regulations and Rulings to substantiate her subjective allegations of disabling symptoms.

(Tr. 22).  The credibility analysis requires determining whether there exists a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms and if the severity of the symptoms is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements.  SSR 96-7p.  The ALJ did the first part of the credibility analysis when making a Step Two finding of Plaintiff's severe impairments, however, the ALJ did not assess the credibility of Plaintiff's subjective statements in totality of the above enumerated factors.  SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Canales v. Barnhart*, 308 F. Supp. 2d 523, 527 (E.D. Pa. 2004).

An ALJ must give serious consideration to a claimant's subjective complaints, even where those complaints are not supported by objective evidence. *See Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984). Where medical evidence does support a claimant's subjective complaints, the complaints should then be given "great weight" and may not be disregarded unless there exists contrary medical evidence. *See Ferguson,* 765 F.2d at 37; *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993); *cf. Carter v. R.R. Ret. Bd.*, 834 F.2d 62, 65 (3d Cir. 1987). Section 416.929(c) instructs:

> However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work (or if you are a child, to function independently, appropriately, and effectively in an age-appropriate manner) solely because the available objective medical evidence does not substantiate your statements.

20 C.F.R. § 416.929(c). Thus while there must be objective medical evidence of some condition that could reasonably produce the alleged symptoms, there need not be objective evidence of the symptoms itself. *Green v. Schweiker*, 749 F.2d

1066, 1071 (3d Cir. 1984); see also *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

Given the great significance of Plaintiff's credibility to substantiate her subjective psychological impairments, substantial evidence does not support the ALJ's credibility determination and decision.

### 2. Non-Compliance with Medical Treatment

Without specifying where the ALJ stated that an adverse inference was made regarding Plaintiff's non-compliance with treatment, Plaintiff asserts the ALJ erred by counting Plaintiff's non-compliance against her. Pl. Brief at 33-35. With regards to Plaintiff's non-compliance, the ALJ wrote:

> [Plaintiff] has repeatedly failed to comply with recommended, and in some instances mandated, courses of treatment. For instance, medical records from August 2007 reflect that [Plaintiff] was still using alcohol and marijuana. In December 2007 [Plaintiff] reported to her doctor that she stopped taking her prescribed medications because of her pregnancy and purported concern for her unborn child. However, the record reflects that [Plaintiff] continued to drink alcohol, smoke marijuana and use crack cocaine during her pregnancy. [Plaintiff] was uncooperative and negative during drug and alcohol treatment and her participation level was described as "none to passive". [Plaintiff] has repeatedly sought early discharge from detoxification and treatment programs, against explicit advice of her doctors. Nevertheless, [Plaintiff] apparently completed a course of rehabilitative treatment in February 2008, only to relapse and use crack and alcohol again in

March 2008. She was mandated to go through rehabilitation programs again, apparently as a condition of avoiding jail time. She again failed to complete the treatment program. Progress notes from March 2009 and medical records from May 2009 show that [Plaintiff] had relapsed in February 2009 and again in April 2009. She began attending treatment at New Dawn from April 2, 2009, but was discharged after only a few days and prior to completing the program for non-compliance. Concerned that her discharge from the program could result in jail time, she sought to return to New Dawn. She was permitted to return for treatment on May 1, 2009. However, on May 20, 2009, she was again discharged without completing the program. On May 21, 2009, [Plaintiff] reported to the emergency room with superficial lacerations to her left wrist and complaints of increased depression . . . . Drug tests performed that day were positive for cannabinoids, indicating recent marijuana use.

(Tr. 22-23) (internal citations omitted). The ALJ does not immediately explain the purpose of citing to this evidence, however, at another part of the ALJ decision, Plaintiff's relapses is used, in part, to discredit the medical opinion of Dr. Pruett. It is reasonable for Plaintiff to interpret that the ALJ's enumeration of Plaintiff's many relapses and failures to comply with treatment is for the purpose of drawing an adverse inference regarding Plaintiff's credibility.

It is error to draw adverse inferences from a claimant's failure to comply with treatment without addressing whether the non-compliance was due to her mental illness. *See e.g.*, SSR 96-7p (stating that an adjudicator must not draw any

inferences about an individual's symptoms from a failure to pursue regular medical treatment without first considering any explanations); *Pate-Fires v. Astrue*, 564 F.3d 935, 945-47 (8th Cir. 2009); *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D. Pa.1996) (citing *Sharp v. Bowen*, 705 F.Supp. 1111, 1124 (W.D. Pa.1989)).

The United States Court of Appeals for the Eighth Circuit has observed that "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (quoting *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D. Pa. 1996); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1083-84 (10th Cir. 2004); *Hennion v. Colvin*, No. 3:13-CV-00268, 2015 WL 877784, at *24 (M.D. Pa. Mar. 2, 2015); *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 807 n. 14 (W.D. Pa. 2012). The Eighth Circuit further observed that "[c]ourts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication." *Pate-Fires v. Astrue*, 564 F.3d 935, 945-46 (8th Cir.

2009) (internal quotation marks omitted). Courts have acknowledged that noncompliance with treatment is especially prevalent among patients with bipolar disorder. *See e.g.*, *Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006); *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 807 n. 14 (W.D. Pa. 2012); *Pounds v. Astrue*, 772 F. Supp. 2d 713, 723 n. 21 (W.D. Pa. 2011) (observing that "non-compliance is a hallmark of bipolar disorder, particularly when the person is in the manic phase"); *Howard v. Astrue,* 2010 WL 1372662, at *6 n. 2 (W.D.Okla. Mar. 9, 2010) (noting that "[n]oncompliance with medication is a very common feature among bipolar patients. Rates of poor compliance may reach 64% for bipolar disorders, and noncompliance is the most frequent cause of recurrence.") (internal quotations and citations omitted). The United States Court of Appeals for the Seventh Circuit has explained:

> [I]t is true that bipolar disorder is treatable by drugs. But mental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease) may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment. The administrative law judge did not consider this possibility.

*Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006) (internal citations omitted).[8]  In *Pate-Fires*, the Eighth Circuit determined that substantial evidence did not support an ALJ's determination that the plaintiff's noncompliance was due to her free will when doctors opined that her judgement and insight were impaired and she was suffering from '[v]ague and paranoid delusions;' the plaintiff stated that she did not like the side effects, and explained that she discontinued her medication because she felt that she did not need them.  *Pate-Fires v. Astrue*, 564 F.3d 935, 946 (8th Cir. 2009).

As will be explained below, the ALJ erred in his DAA analysis and in discrediting the medical opinions regarding materiality.  The record demonstrates that Plaintiff has a history of mental health challenges and poor insight and judgement regarding her health.

The Court notes that:

> several courts have questioned the relevance of infrequent medical visits in determining when or whether a claimant is disabled. For example, the Court of Appeals for the Ninth Circuit has held that the fact that a "claimant may be one of the millions of people who did

---

[8] The Seventh Circuit also observed that "bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms. . . . the fact that substance abuse aggravate[s] [one's] mental illness does not prove that the mental illness itself is not disabling."  *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006).

not seek treatment for a mental disorder until late in the day" was not
a substantial basis to reject that an impairment existed. *Nguyen v.
Chater*, 100 F.3d 1462, 1465 (9th Cir.1996).

*Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003). Based on the

foregoing, the Court concludes that the ALJ erred in drawing an adverse inference

from Plaintiff's non-compliance with treatment.

### 3. Work History

The Court finds that the ALJ erred in drawing an adverse inference from

Plaintiff's expressed desires and attempts to work. The ALJ concluded:

[Plaintiff] reported during one hospitalization that she planned to
work at a pig farm upon discharge. In August 2007, [Plaintiff] sought
a physical examination for purposes of obtaining clearance to work.
This reflects that [Plaintiff] believed she was capable of working.

(Tr. 23) (internal citation omitted). Earnings reports demonstrate that Plaintiff has

worked several jobs with the following annual earnings: 1) 2004: met earning

threshold for three quarters of coverage with two employers, totaling $3465.68; 2)

2005: met earning threshold for two quarters of coverage with four employers,

totaling $2456.43; 3) 2006: met earning threshold for first three quarters of

coverage with two employers, totaling $2972.43; 4) 2007: did not meet earning

threshold for any quarter of coverage with one employer, totaling $207.25); 2008:

none.  (Tr. 240-41, 248-49).  In a Work Activity Report dated May 1, 2008, a Social Security Agency reviewer noted that her work history looked "like a string of unsuccessful work attempts" which would be "[consistent with] symptoms shown by many [with] depression and borderline personality disorder--working fulltime for short periods, but then, leaving abruptly."  (Tr. 266) (capitalization modified from original). Plaintiff also testified that she has never had a full-time job, and only one job that had lasted more than three months.  (Tr. 70-72).

Under ruling 96-7p, a credibility determination of an individual's statements about pain or other symptoms and about the effect the symptoms can be based on "[s]tatements and reports from the individual and from treating or examining physicians or psychologists and other persons about . . .  prior work record and efforts to work . . . ."  SSR 96-7p; *see also Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979) (Work history is a proper consideration in the credibility assessment).

The inferences drawn from a claimant's work history vary depending on the facts.  *See e.g.*, *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979) (holding that a claimant's testimony "is entitled to substantial credibility" where

the claimant has a lifetime record of continuous work); *Ford v. Barnhart*, 57 F. App'x 984, 988 (3d Cir. 2003) (finding no error where an ALJ made an adverse credibility determination based on erratic pre-onset work history); *Crotsley v. Astrue*, No. CIV.A. 3:10-88, 2011 WL 5026341, at *4 (W.D. Pa. Oct. 21, 2011) (an inference of a lack of motivation to work can be drawn from a sporadic work history prior to disability onset); *Collins v. Astrue*, No. CIV.A. 11-1275, 2012 WL 2930885, at *11 (W.D. Pa. July 18, 2012) (an inference of a lack of motivation to work can be drawn from a sporadic work history prior to disability onset); *Henderson v. Astrue*, No. CIV.A. 10-1638, 2011 WL 6056896, at *6 (W.D. Pa. Dec. 6, 2011) (post onset part-time work could support a finding of non-disability); *Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989) (sporadic work-history as evidence of mental impairment); *Smith v. Heckler*, 735 F.2d 312, 318 (8th Cir. 1984) (finding error where ALJ determined that a claimant lacked motivation, however, the ALJ failed to address claimant's history of work attempts and testimony which supported that claimant simply lacked basic mental ability to follow directions without constant supervision).

Although a sporadic work history may lend to an inference of a lack of motivation to work, a sporadic work history within the mental health context could also allow for the opposite conclusion. *See Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989); *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986); *Smith v. Heckler*, 735 F.2d 312, 318 (8th Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 709 (8th Cir. 1982) (holding that the plaintiff's personality disorder rendered him unable to engage in substantial gainful employment and required a finding of disability where the plaintiff held 46 jobs in twelve years, his longest tenure was six months, and he was fired from most of these jobs). Thus it is crucial for an ALJ to explicitly weigh all relevant, probative, and available evidence; and provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *Smith v. Califano*, 637 F.2d 968, 971-72; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (addressing the context of mental health disability and drawing inferences from report of activities). In *Leidler v. Sullivan* the Fifth Circuit observed that:

> [i]n cases of severe mental illness a claimant's sporadic work history does not conflict with a finding of the onset of disability during a particular twelve-month period, and that [the claimant] is disabled if

[the claimant] can perform work but not enjoy sustained employment because of his [or her] condition.

*Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989) (citing to *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986)).

The Court finds that the ALJ failed to address Plaintiff's desire to work in the context of the longitudinal picture of Plaintiff's overall failed work attempts.

## B. Failure to Weigh all Evidence in Support of Plaintiff's Claim

Substantial evidence does not support the ALJ opinion as the ALJ selectively overemphasized the aspects of Plaintiff's medical records that support a finding of non-disability but failed to appropriately account for evidence that would support a contrary conclusion. For example, the ALJ placed too great of an emphasis on Plaintiff's function report which was made at the time while she was in a highly regulated mental health halfway house, while omitting relevant evidence that demonstrates the severity of Plaintiff's impairments. The ALJ determined:

> In social functioning, [Plaintiff] has moderate difficulties. She spends time with others, visits her children, and reports no problems getting along with family, friends, neighbors or others (Exhibit 5E, p. 7). She also reports no problems getting along with bosses, teachers, police, landlords or other people in authority and has never lost a job due to

problems getting along with others (Exhibit 5E, p. 8-9). During psychiatric consultative examination [Plaintiff's] manner of relating, social skills and overall presentation was adequate (Exhibit 18F, p. 3). She does have a history of some problems dealing with being around other people in a workplace. With regard to concentration, persistence or pace, [Plaintiff] has mild difficulties. She reports that she is able to finish what she starts, despite problems paying attention (Exhibit 5E, p. 8). She is able to follow written instructions, but spoken instructions must be repeated (Exhibit 5E, p. 8).

(Tr. 20). The ALJ also observed:

In terms of [Plaintiff]'s alleged mental impairments, there is little evidence to support her allegations. One week after delivering her baby boy in January 2007, [Plaintiff] reported to the emergency room repo1ting feeling sad. She was evaluated by a psychiatrist who diagnosed [Plaintiff] with adjustment reaction with depressed mood. He noted that [Plaintiff] was well oriented, made good eye contact and talked easily. He found no evidence of any psychosis, and noted that [Plaintiff's] mood was more tired than depressed. Progress notes from May, June and July 2008 show that [Plaintiff] was friendly and cooperative, had no problems with mood swings, and was not depressed or anxious. During mental status examination [Plaintiff] was alert and cooperative, made good eye contact. Her affect was full, but her mood was euthymic.

(Tr. 22) (internal citations omitted).

"Although we do not expect the ALJ to make reference to every relevant treatment note . . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities

under the regulations and case law." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). The ALJ may properly accept some parts of the medical evidence and reject other parts, but must consider all the evidence and give some reason for discounting the rejected evidence. *See Adorno v. Shalala*, 40 F.3d 43, 48; *see also Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 435 (3d Cir. 1999) ("[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence....") (citation omitted); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (reiterating standard forbidding the "cherry-picking" of the medical record). An ALJ cannot rely only on the evidence that supports his or her conclusion, but also must explicitly weigh all relevant, probative, and available evidence; and provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

A residual functional capacity assessment must be based on consideration of all the evidence in the record, including the testimony of the claimant regarding his or her activities of daily living, medical records, lay evidence, and evidence of

pain.  *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121-22 (3d Cir. 2000).  Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.  *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).  "Federal courts have repeatedly held that an ALJ cannot speculate as to a Plaintiff's RFC; medical evidence speaking to a claimant's functional capabilities that supports the ALJ's conclusion must be invoked."  *Biller v. Acting Comm'r of Soc. Sec.*, 962 F.Supp.2d 761, 779 (W.D. Pa. 2013) (citations omitted); *see also Gormont v. Astrue*, 2013 WL 791455, at *8 (M.D. Pa. 2013).

The ALJ rejected, in part, Plaintiff's psychological impairments because, at various times, she was noted to appear cooperative, friendly, and making good eye-contact.  (Tr. 22).  The Court finds that the ALJ's overemphasis on external indicia of demeanor and observations, while undervaluing the import of Plaintiff's instability, requirement for supervised visits to her children, history of trying to

attack her one-year-old and ex-boyfriend with a knife, and attacking her parents, amounts to error. *See Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity . . . . It is well established that sporadic or transitory activity does not disprove disability"); *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) (finding error where the ALJ concluded that medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving normally during her office visits. Concluding, "[t]here was no contradiction; bipolar disorder is episodic"). In *Morales v. Apfel*, the Third Circuit found that a doctor's observations that a patient is "stable and well controlled with medication" during treatment did not support the medical conclusion that the patient could return to work. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). Furthermore, a lay interpretation of a Plaintiff's demeanor during an examination free from the stresses of a work environment will not contradict evidence reflecting Plaintiff's serious impairments. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000).

The Court is persuaded by *Bauer v. Astrue*, where the Seventh Circuit observed:

> Many of the reasons offered by the administrative law judge for discounting the evidence of [the plaintiff's treating doctors] suggest a lack of acquaintance with bipolar disorder. For example, the judge noted that the plaintiff dresses appropriately, shops for food, prepares meals and performs other household chores, is an "active participator [*sic*] in group therapy," is "independent in her personal hygiene," and takes care of her 13-year-old son. This is just to say that the plaintiff is not a raving maniac who needs to be locked up. She is heavily medicated, and this enables her to cope with the challenges of daily living, and would doubtless enable her to work on some days.

*Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (emphasis added). A focus on indicia of Plaintiff's momentary increased functioning to the exclusion of evidence demonstrating impaired functioning goes against the requirement for the ALJ to evaluate all relevant evidence. *See* 20 C.F.R. § 404.1520a(c)(1); *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00 Mental Disorders (B) (recognizing that for mental impairment "[t]he symptoms and signs may be intermittent or continuous depending on the nature of the disorder.").

The ALJ overlooked a considerable amount of probative evidence that could lead to a contrary decision. For example, the ALJ placed too much emphasize on Plaintiff's self-function reports which were completed while she lived at a highly

structured mental health halfway house.  (Tr. 285, 287).  Plaintiff's self-function report reflecting that she "visits her children, and reports no problems getting along with family, friends, neighbors or others" is not addressed in the context that she tried to attack her son and ex-boyfriend with a knife, hurts her parents, and had an altercation with a counselor.  Plaintiff testified that as a result of a neglect charge, she is required to be supervised in the presence of her children.  (Tr. 79).  Plaintiff explained that the neglect charge stemmed from when she was taken off of medication and "went after [her] fiancé and [her] oldest son with a knife."  (Tr. 80).  There is no evidence that Plaintiff ever lived alone.  It appears that she either lived with an abusive boyfriend, in shelters, a halfway house, or her parents. Plaintiff testified that she was living with her parents and added that she did not think that she could live on her own.  (Tr. 48).  Plaintiff testified that she stopped a day program when she had an altercation with one of the counselors.  (Tr. 83). Plaintiff reported that she still had problems with daily anger outbursts and if she can detect the signs she will walk away from the situation, otherwise, her mother or father "ends up getting hurt."  (Tr. 48).

The ALJ's disregard of evidence that supports Plaintiff's claim amounts to error. *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 435 (3d Cir. 1999); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014).

## C. Weight of Dr. August's January 2012 Opinion

With regard Dr. Pruett's medical opinion, the ALJ gave the opinion "only partial weight" because "the repeated relapses, both before and after December 2008, undermine Dr. Pruett's conclusion as to the materiality of [Plaintiff]'s substance abuse in relation to her psychiatric symptoms." (Tr. 24). For the opinion of Plaintiff's treating psychiatrist, Dr. Khan, that Plaintiff's impairments are unrelated to drug use, the ALJ stated:

> As noted there this report seems to adopt entirely the attached assessment form from Cheryl Pruett. But that is essentially the problem here: this extremely cursory statement, without recital of any medical confirmatory details, is clearly just a rubber-stamping of the therapist's report, and thus adds nothing further of any significant evidentiary weight. It cannot really change the only partial weight that may be granted the therapist's ideas about remaining mental capacities.

(Tr. 24).

Substantial evidence does not support the ALJ's according little weight to these opinions.

An ALJ may point to inconsistencies between the physician's opinion and treatment record to credit one opinion over another, *Plummer v. Apfel*, 186 F.3d 422, 430 (3d Cir. 1999), but only if the treatment notes address ability to function in a work setting. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008). When using internal inconsistencies to discredit a treating physician's report, the internal discrepancies must be truly contradictory. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008); *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000); *see also Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006).

The United States Court of Appeals for the Third Circuit in *Brownawell* found error where the ALJ rejected a consultative examiner's opinion on the basis that observations of the claimant at the time of an examination contrasted with an ultimate opinion of the claimant's ability to work. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008). The Third Circuit found that a doctor's statement that a claimant had "no ability to maintain attention or

concentration" in the work setting was not contradicted by the observation during the examination that the claimant had "good focus, good attention, and good concentration." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008). The Court in *Brownawell* explained that:

> [t]hese assessments are not necessarily contradictory, however, as one assessment was describing [the claimant's] condition at the time of . . . [the] examination and the other reflected [the doctor's] assessment of [the claimant's] ability to function in a work setting. As discussed supra, this Court has admonished ALJs who have used such reasoning, noting the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work.

*Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008). The Third Circuit also found that a doctor's observation that a claimant is "stable and well controlled with medication" during treatment does not contradict the opinion that the claimant's mental impairment rendered him markedly limited in a number of relevant work-related activities. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). The Third Circuit cautioned that a doctor's opinion that a claimant's ability to function is seriously impaired or nonexistent in every area related to work "shall not be supplanted by an inference gleaned from treatment records reporting on the

claimant in an environment absent of the stresses that accompany the work setting." *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000).

With regard to Dr. Pruett's opinion, Plaintiff's "repeated relapses" before and after December 2008 do not truly contradict the medical opinion, rather the ALJ is impermissibly reinterpreting the medical evidence and using his lay interpretation of the import of the relapses as a basis to discredit Dr. Pruett's medical opinion. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986); *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *see also Himes v. Comm'r of Soc. Sec.*, 585 F. App'x 758, 767 (11th Cir. 2014) (finding error where the ALJ's reinterpreted an impairment as a "temper problem" as opposed to a mental illness identified by physicians' opinions).

With regards to Dr. Khan's opinion, the ALJ erred in discrediting the opinion on the basis of its brevity when, in fact, there was ample treatment records from Dr. Khan from which Dr. Khan based his opinion.

In this instance, the ALJ gave little weight to the DAA materiality opinions of Drs. Pruett and Khan, and made a residual functional capacity determination

without citing to assessments from a doctor to support a contrary opinion. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986). Without any medical opinion being credited to counter the expert medical opinions, the Court finds that the ALJ impermissibly relied on speculation or lay interpretation of medical evidence to reach the conclusion regarding Plaintiff's DAA and residual functional capacity. *See Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) (The ALJ may not substitute his own judgment for that of a physician).

Based on the foregoing, substantial evidence does not support the ALJ's allocation of weight to Drs. Pruett and Khan's medical opinions.

### D. Drug Addiction and Alcoholism ("DAA") Analysis

The Court finds that the ALJ erred in the DAA analysis by separating out what treatment was "primarily" for substance abuse as opposed to psychiatric symptoms independent of DAA. The ALJ wrote:

> As for episodes of decompensation, [Plaintiff] has experienced perhaps one or two episodes of decompensation that resulted in hospitalization and which were based in primarily psychiatric symptoms independent of DA&A (drug addiction and/or alcoholism and/or related substance abuse disorders). She was hospitalized in January 2010 for a suicide attempt secondary to a medication

overdose, but responded readily to appropriate treatment for this depression which appeared to be primarily situational in response to unusual stresses at home. The record reflects that other episodes of record were a consequence of [Plaintiff]'s continued drug use and repeated relapses. [Plaintiff's] hospitalizations during the period being adjudicated were mainly for treatment for drug and alcohol rehabilitation. Because [Plaintiff]'s mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

(Tr. 20-21) (internal citations omitted).  The ALJ further opined:

Other records have related primarily to her continued drug and alcohol use, rather than mental health conditions, and reveal that [Plaintiff] has repeatedly failed to comply with recommended, and in some instances mandated, courses of treatment.

(Tr. 22).

Section 105 of the Contract With America Advancement Act of 1996 ("CWAAA") amended the Social Security Act to provide that "an individual shall not be considered to be disabled" thereunder if "alcoholism or drug addiction" would be "a contributing factor material to the Commissioner's determination that the individual is disabled." Pub.L. No. 104–121, § 105; 110 Stat. 847, 852–853 (1996); 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. § 416.935(a); *accord Thornhill v. Colvin*, No. CIV.A. 13-530, 2014 WL 1328153, at *3 (W.D. Pa. Apr.

2, 2014). The SSA has published policy interpretation rulings, the latest version of which is SSR 13–2p, 78 Fed.Reg. 11939 (Feb. 20, 2013), setting forth the process to be followed in conducting a DAA materiality inquiry.[9] Further, the SSA has provided guidance on the considerations for a DAA materiality inquiry through its Program Operations Manual System. *See* POMS § 90070.050.

The claimant bears the burden of production with respect to the issue of materiality. *Thornhill v. Colvin*, No. CIV.A. 13-530, 2014 WL 1328153, at *8 (W.D. Pa. Apr. 2, 2014). Section 416.935, SSR 13–2p, and POMS 90070.050 set forth the applicable process for an adjudicator to determine whether DAA is a material contributing factor to a claimant's disability. First, the ALJ must decide if the claimant is disabled, following the general disability case development and evaluation procedures and considering the effects of DAA. POMS § 90070.050(B)(1). Second, the ALJ must decide if there is "medical evidence of DAA." POMS § 90070.050(B)(2). Finally, if there is medical evidence of DAA,

_____

[9] Social Security Ruling 13–2p was published on February 20, 2013 and, thus, came into effect after the ALJ's decision in this case was issued. Prior to the publication of SSR 13–2p, the principles discussed herein were substantially set forth in a prior policy interpretation ruling, SSR 82–60, as well as a "teletype" issued by the Commissioner, Emergency Message EM–96200. SSR 13–2p superseded both SSR 82–60 and EM–96200. For clarity, the Court refers to SSR 13–2p in this Report and Recommendation; however, it should be recognized that the ALJ did not have the benefit of that ruling when making her decision.

the ALJ must re-evaluate the claimant as if the claimant had stopped using drugs and alcohol, and on that basis decide whether the DAA is a contributing factor material to the disability. POMS § 90070.050(B)(3), (D); 20 C.F.R. § 416.935(b)(2); SSR 13–2p, 78 Fed.Reg. at 11941–42.

Stated differently, a DAA materiality determination is made only when "the claimant is disabled considering all impairments" and the ALJ has "medical evidence from an acceptable medical source establishing that a claimant has a Substance Use Disorder." SSR 13–2p, 78 Fed.Reg. at 11941.

"Medical evidence of DAA" is a specifically defined term for purposes of the Social Security Act. SSR 13–2p, 78 Fed.Reg. at 11944; POMS § 90070.050(C)(1)(a). It means that the evidence is from "an acceptable medical source" and "[i]s sufficient and appropriate to establish that the individual has a medically determinable substance use disorder." POMS § 22505.003(B)(1); POMS § 90070.050(C)(1)(a). "[A] claimant has DAA only if he or she has a medically determinable Substance Use Disorder" as defined in *Diagnostic and Statistical Manual of Mental Disorders* (or "DSM"). SR 13–2p, 78 Fed.Reg. at 11941. "In general, the DSM defines Substance Use Disorders as maladaptive

patterns of substance use that lead to clinically significant impairment or distress."

*Id.* at 11940 (footnote omitted) (citing *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text rev. 2000) ("DSM–IV–TR").  As explained further by the SSA:

> (i) As for any medically determinable impairment, we must have objective medical evidence—that is, signs, symptoms, and laboratory findings—from an acceptable medical source that supports a finding that a claimant has DAA. This requirement can be satisfied when there are no overt physical signs or laboratory findings with clinical findings reported by a psychiatrist, psychologist, or other appropriate acceptable medical source based on examination of the claimant. The acceptable medical source may also consider any records or other information (for example, from a third party) he or she has available, but we must still have the source's own clinical or laboratory findings. (ii) Evidence that shows only that the claimant uses drugs or alcohol does not in itself establish the existence of a medically determinable Substance Use Disorder.... In addition, even when we have objective medical evidence, we must also have evidence that establishes a maladaptive pattern of substance use and the other requirements for diagnosis of a Substance Use Disorder(s) in the DSM. This evidence must come from an acceptable medical source.

SSR 13–2p; 78 Fed.Reg. at 11944.

Although an ALJ may make a materiality finding without "expert psychiatric opinion evidence," "[w]hen it is not possible to separate the mental restrictions and limitations imposed by DAA [drug and alcohol addiction] and the

various other mental disorders shown by the evidence, a finding of 'not material' would be appropriate." *McGill v. Comm'r of Soc. Sec.,* 288 F. App'x 50, 52-52 (3d Cir.2008) (unpublished) (quoting EM–96200). *McGill v. Commissioner of Social Security*, 288 Fed.Appx. 50, 53 (3d Cir.2008). Social Security Ruling 13-2p explicitly recognizes that no "research data" exists that could be "use[d] to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol." Social Security Ruling 13–2p; *accord Thornhill v. Colvin*, No. CIV.A. 13-530, 2014 WL 1328153, at *6 (W.D. Pa. Apr. 2, 2014).

Since the ALJ decision failed to include Plaintiff's DAA-related hospitalizations as a part of the Listing analysis, and erroneously discounted the medical opinions of Drs. Pruett and Khan regarding DAA materiality, there is no substantial evidence to support the determination that Plaintiff would not still be disabled if the substance abuse were to stop. *See* 20 C.F.R. § § 404.1535, 416.935. Therefore, the ALJ's decision is not supported by substantial evidence.

### E. Remaining issues

Because Plaintiff's case will be remanded for the ALJ's failure to further development and to consider and analyze all relevant medical evidence regarding her mental impairments, it is unnecessary to examine Plaintiff's remaining claims. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at \*7 (W.D. Pa. Apr. 14, 2011).

## IV.    Conclusion

Based on the foregoing, the Court finds that the ALJ's decision lacks substantial evidence.    Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.


Dated: September 30, 2015                         *s/Gerald B. Cohn*
                                        GERALD B. COHN
                                        UNITED STATES MAGISTRATE JUDGE